**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

AT&T MOBILITY LLC,

               Plaintiff,

    v.

MICHAEL PRINCI,

               Defendant.

Civil Action No.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Plaintiff AT&T Mobility LLC ("ATTM"), by its undersigned attorneys, for its Complaint against defendant Michael Princi, alleges as follows:

**NATURE OF THE ACTION**

1.     ATTM has filed this action to enforce its right under the governing arbitration agreement, the Federal Arbitration Act, and state contract law to require that its customers pursue their disputes in arbitration in accordance with their arbitration agreements, which place express limitations on the matters that may be arbitrated. Defendant is among the 1,000 (and counting) ATTM customers whom the law firm of Bursor & Fisher P.A. ("Bursor") has solicited and now claims to have recruited as part of a scheme to pressure ATTM into settling meritless claims. Under the "plan" brazenly announced on Bursor's website, defendant and the other claimants intend to "use AT&T's own Arbitration Agreement" against ATTM by filing "thousands" of copycat consumer arbitrations seeking identical, class-wide relief: a blanket injunction prohibiting ATTM from completing its $39 billion merger with T-Mobile USA, Inc. ("T-Mobile"). As part of this effort, Bursor has enlisted the law firm of Faruqi & Faruqi, LLP ("Faruqi"), whose lawyers are six of the claimants who have filed Demands for Arbitration thus

far.  Although the claim is meritless, the Bursor and Faruqi firms are hoping that thousands of "bites at the same apple" will turn up just one arbitrator willing to entertain it—and that ATTM will hedge against that risk by entering into an extortionate settlement.

2.       Bursor and Faruqi's scheme plainly violates the arbitration agreement between ATTM and defendant (attached as Exhibit A).   Among other limitations on the scope of arbitration, the agreement expressly precludes "any form of representative or class proceeding" and permits claims for injunctive relief "only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." Defendant's and the other claimants' Demands for class-wide injunctive relief—if granted in even one arbitration notwithstanding the complete absence of factual or legal support and notwithstanding the express limitations in the arbitration agreement—would directly affect more than 120 million wireless customers and millions of other individuals and businesses, as well as federal, state, and local governments which are not represented in these arbitration proceedings. Accordingly, these Demands fall far outside the scope of this provision.

3.       Bursor and Faruqi seek this wide-ranging relief in proceedings that would exclude the millions of customers and countless organizations and government entities that would be affected by the class-wide, non-individualized relief that defendant demands—including the hundreds of government officials, organizations, businesses, and individuals who wish to realize the benefits that would result from the merger, including:

a.       the more than 120 million ATTM and T-Mobile customers, who would benefit from better service, fewer dropped calls, and faster data downloads, as well as the 55 million Americans to whom the combined company will offer a state-of-the-art 4G LTE mobile broadband service that would not be available from either company without the merger;

2

b.      the governors of 26 states, state attorneys general in 11 states, and over 75 members of the United States Senate and House of Representatives who have expressed their support for the merger to the Federal Communications Commission ("FCC");

c.      labor unions representing 20 million workers and educators, including the Communications Workers of America, the AFL-CIO, the Teamsters, the Service Employees International Union, the International Union of Painters and Allied Trades, the United Food and Commercial Workers, the United Mine Workers of America, the National Education Association, and the American Federation of Teachers, who have urged FCC approval of the merger;

d.      leading mobile computing technology businesses, including equipment and handset manufacturers (*e.g.*, Qualcomm, Corning, Research in Motion, Pantech, Avaya, Juniper Networks, Brocade, JDS Uniphase, Amdocs, Tellabs, ADTRAN, and Sierra Wireless) providers of applications, content, and technology (*e.g.*, Facebook, Microsoft, Oracle, and Yahoo!), and venture capital firms (*e.g.*, Kleiner Perkins Caufield & Byers, Sequoia Capital, Charles River Ventures, Matrix Partners, New Venture Partners, Technology Crossover Ventures, Radar Partners, Norwest Partners, and Lightspeed Ventures), who have endorsed the merger as a means of addressing rising consumer demand for wireless services and fueling innovation and investment in U.S. high-tech industries;

e.      public interest groups representing the interests of minorities (*e,g.*, the NAACP, the Hispanic Institute, and the United States Hispanic Chamber of Commerce), people with disabilities (*e.g.*, Institute on Disability, the American Foundation for the Blind, the American Association of People with Disabilities, and the United Spinal Association), rural citizens (*e.g.*, the National Grange, the U.S. Cattlemen's Association, the National Black

Farmers Association, the Intertribal Agriculture Council, and the National Rural Health Association), and supporters of environmental protection (*e.g.*, the Sierra Club and Future 500), who support the merger based on the benefits their respective constituents will realize as a result of the merger, such as the enormous beneficial economic impact for rural America and the U.S. economy as a whole that will result from the $8 billion network investment that will be used to integrate the networks and expand 4G LTE service to 97% of Americans; and

f.     T-Mobile USA, Inc. and its parent company, Deutsche Telekom AG, which obviously have an interest in the consummation of the merger, and would have their rights determined in arbitration proceedings to which they are not parties, should the Bursor and Faruqi scheme be permitted to continue.

4.     Each of the improper individual arbitration proceedings that Bursor and Faruqi seek to initiate is an attempt to displace the rigorous, congressionally mandated inquiries already being conducted by the U.S. Department of Justice ("DOJ") and the FCC into, among other things, the technological and competitive characteristics of wireless service provided by the merging parties in hundreds of individual cellular market areas nationwide and the public benefits resulting from the transaction.  In addition, the public utility commissions in five states—Arizona, California, Hawaii, Louisiana, and West Virginia—have reviewed or are currently reviewing the merger, with three of those commissions (Arizona, Louisiana, and West Virginia) already having granted approval.  Teams of government lawyers, economists, engineers, and network specialists have been hard at work analyzing—and will continue analyzing for at least the next several months—numerous disputed issues of antitrust law, econometrics, network infrastructure and design, and wireless technology, presented through hundreds of thousands of pages of briefs, business documents, declarations, and other

submissions and from dozens of witnesses.  Under Bursor and Faruqi's scheme, each arbitration panel potentially could be faced with the very same issues and evidence that the regulators are evaluating—in addition to the many non-issues that Bursor and Faruqi concoct in the Demands.

a.      For example, issues have been raised in regulatory proceedings regarding the relevant product and geographic markets that should frame the merger analysis.  Similar issues would likely be raised in the arbitrations.

b.      With respect to each market and in general, there will be competing testimony and (at least on ATTM's side) highly sophisticated and complex econometric and engineering models and other evidence demonstrating the merger's enormous efficiencies and cost savings as well as other pro-competitive effects on pricing, quality, network capacity, and innovation.  Each proceeding would necessarily involve a detailed assessment of this evidence as it relates to the benefits to consumers and businesses arising from network synergies realized by the merger, including the increased capacity and output resulting from combining the two companies' spectrum and infrastructure; an analysis of the relationship between increases in capacity and output and the resulting effect on marginal costs and prices charged to consumers; and the impact of other synergies.  Each proceeding would also likely require analysis of the competitiveness of wireless services before and after the merger in scores of markets around the country.

c.      In addition to placing in issue the impact on services to ATTM's retail customers, based on the allegations made in the Demands, Bursor and Faruqi likely will attempt to expand the scope of each proceeding to address a host of other issues that have been raised by various merger opponents in the FCC proceeding, including the merger's impact on various "inputs" for the provision of wireless service, such as roaming, wireless backhaul services, and

wireless devices, which are provided in a global marketplace. Indeed, the FCC has been evaluating and gathering data on the marketplace for wireless backhaul for years.

5.      Given the extraordinarily broad nature of the proceedings that would take place with respect to the defendant's Demand alone, it makes practical sense to determine whether these arbitrations may proceed in the first place.

6.      Even more important, the law requires as much. Questions of arbitrability—including whether the Demand is outside the scope of the parties' arbitration agreement—are for courts to decide in the first instance. If this Court does not intercede, ATTM would be deprived of its contractual and statutory right to threshold review by a court of the arbitrability of the claims and the authority of the arbitrator to decide them. In the meantime, ATTM will be forced to incur massive costs and the loss of its rights under the Federal Arbitration Act ("FAA") and its arbitration agreements.

7.      Accordingly, this Court should preliminarily and permanently enjoin defendant from continuing the arbitration he has initiated against ATTM and issue a declaratory judgment stating that defendant's Demand may not be pursued in arbitration.

## PARTIES, JURISDICTION AND VENUE

8.      Plaintiff ATTM is a limited-liability company organized and existing under the laws of Delaware, with its headquarters and principal place of business in Georgia. ATTM is an indirect, wholly owned subsidiary of AT&T Inc. ("AT&T"), and has five members:

   a.   SBC Long Distance, LLC, a Delaware limited liability company whose sole member, SBC Telecom, Inc., is a Delaware corporation with its principal place of business in Texas;

    b.   SBC Alloy Holdings, Inc., a Delaware corporation with its principal place of business in Texas;

    c.   AT&T Mobility Corporation, a Delaware corporation with its principal place of business in Georgia;

    d.   New BellSouth Cingular Holdings, Inc., a Delaware corporation with its principal place of business in Georgia; and

    e.   BellSouth Mobile Data, Inc., a Delaware corporation with its principal place of business in Georgia.

9.    Upon information and belief, defendant Michael Princi is an ATTM customer who resides in Westford, Massachusetts.

10.    This is an action for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202; and the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*

11.    This Court has personal jurisdiction over defendant because, upon information and belief, he is a resident of the State of Massachusetts.

12.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the underlying dispute involves a federal question under the Clayton Antitrust Act of 1914 (the "Clayton Act"), 15 U.S.C. §§ 18, 26.

13.    This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy, exclusive of costs and interest, exceeds $75,000.   In particular, the purchase price of the merger that defendant wrongfully seeks to enjoin is approximately $39 billion.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because defendant resides in this judicial district.

## FACTUAL BACKGROUND

15.    ATTM is a nationwide provider of wireless voice and data services.  Its network serves more than 97 million mobile customers across the country and spans every major metropolitan area.

16.    On March 20, 2011, AT&T and Deutsche Telekom AG—the parent company of T-Mobile USA, Inc.—announced an agreement under which AT&T will acquire T-Mobile USA for approximately $39 billion.

17.    The merger between ATTM and T-Mobile is currently being reviewed by the DOJ, the FCC, certain state Attorneys General, and various other state regulators.  The FCC and DOJ began their reviews soon after the merger agreement was announced in March 2011.  The ongoing DOJ and FCC proceedings—which are expected to continue for the next several months—have involved and will continue to involve an intensive commitment of resources on the part of the merging parties, two federal regulatory agencies, and numerous supporters and opponents of the merger.  As an example, on July 13, 2011 the FCC hosted a workshop of economists to discuss issues presented by the merger.  That workshop was attended by 41 FCC and DOJ staff members, 22 representatives of the merging parties, and 21 representatives of Sprint-Nextel, a principal opponent of the merger.

18.    In addition, in the FCC proceedings alone, the merging parties have submitted hundreds of pages of briefs and 19 witness affidavits; over 130 parties have registered their opposition to the merger; and over 400 parties—including labor unions, businesses, public

interest groups, and dozens of state and federal elected officials—have filed in support.  Tens of thousands of individuals have also submitted comments on the merger to the FCC.  Moreover, the FCC has issued comprehensive requests for information to the merging parties, resulting in the production by ATTM of some 1.4 million pages of information and millions of data points related to wireless service across the country for the last three years.  Similar data from competitors of and vendors to the merging parties is being collected and analyzed by the FCC.

19.    Moreover, the public utility commissions of Arizona, California, Hawaii, Louisiana, and West Virginia have commenced proceedings to review the effect of the merger on competition in their respective states.  The commissions in Arizona, Louisiana, and West Virginia have already granted approval of the merger.

a.    The Public Service Commission of West Virginia found that the merger "would not substantially alter the level of competition in the wireless market in West Virginia." *In re AT&T Inc. & T-Mobile USA, Inc. Joint Pet. for Consent & Approval in Advance of AT&T's Acquisition of Stock of T-Mobile USA, Inc. or, in the Alternative, for a Comm'n Order Exempting the Proposed Transaction from the Provisions of W.Va. Code § 24-2-12*, at 5 ¶ 5, Case No. 11-0563-C-PC (W. Va. Pub. Serv. Comm'n July 29, 2011).

b.    The Arizona Corporation Commission held that approving the merger "is in the public interest," noting the staff's conclusion that the anticipated benefits of the merger "are important to the continued and future quality of telecommunications services to Arizona consumers."  *In re the Application of AT&T Commc'ns of the Mt. States on Behalf of Itself, Ariz. Operating Subsidiaries and T-Mobile USA, Inc. for a Limited Waiver of the Comm'n's Affiliated Interest Rules Pursuant to*

*A.A.C. R14-2-806 or, Alternatively, the Notice of Intent Pursuant to A.A.C. R14-2-803*, Decision No. 72441, at 6, 9, Dkt. No. T-02428A-11-0170 (Az. Corp. Comm'n June 27, 2011).

c.   The Louisiana Public Service Commission approved the merger after the staff determined that the merger, among other things, would result in "increased broadband coverage in Louisiana in rural areas[] and create jobs in Louisiana." Staff's Report and Recommendations, at 14, *In re Joint 301 M. Filing Regarding AT&T Inc.'s Acquisition of the Stock of T-Mobile USA, Inc.*, Dkt. No. S-31946 (La. Pub. Serv. Comm'n July 19, 2011).

20.   Despite these monumental, inclusive, and transparent federal and state regulatory proceedings, in July 2011 the Bursor law firm announced "a plan to use AT&T's own Arbitration Agreement to help stop the takeover of T-Mobile."   Bursor declared that it was prepared to institute "thousands" of coordinated copycat arbitrations under the consumer-arbitration provision in ATTM's standard wireless agreement and that each arbitration would seek the same relief: "enjoin[ing] the merger."   To that end, Bursor launched a web site (http://www.fightthemerger.com) designed to solicit ATTM customers to "join that effort" by filling in a form on the site.   In return, Bursor promised that the customers could "seek a $10,000 award" in the arbitrations that take place.

21.   According to one press report, Bursor's stated goal is to coerce "AT&T to settle, given the 'daunting' prospect of fighting more than 750 arbitrations, any one of which could stop the deal."   Terry Baynes, Reuters, Law Firm Strikes Back At AT&T Over Merger (July 27, 2011).   Another press report quotes one of Bursor's co-counsel in these arbitrations, Barry Davis of Thornton, Davis & Fein, as saying that "we will soon have more than one thousand

arbitrations on file, any one of which could stop this merger."  Josh Long, AT&T Customers Challenge T-Mobile Merger Via Arbitration (Aug. 9, 2011), at http://www. partners.//2011//att-customers-challenge-t-mobile-merger-via-arbitration.aspx.  Another reporter quotes Scott Bursor of the Bursor firm as saying: "If we bring 100 cases and lose 99 of them we are going to win."  Ina Fried, All Things D, AT&T Customers File Arbitration Cases Seeking to Block T-Mobile Merger (July 22, 2011), at http://allthingsd./20110722/att-arbitration-seeking-to-block-t-mobile-merger.

22.     Indeed, in an effort to recruit still more claimants, Bursor has issued a press release that misleadingly implies that every customer who files an arbitration demand will receive a $10,000 windfall, so long as any one of them succeeds in persuading an arbitrator to block the merger.  *See* PR Newswire Association LLC, Bursor & Fisher Law Firm Announces more than 1,000 AT&T Customers to File Arbitration Cases Challenging AT&T's Takeover of T-Mobile (Aug. 9, 2011).

23.     Bursor has brought numerous consumer class actions against ATTM and other telecommunications companies.  Based on information and belief, lawyers at Bursor derive a substantial portion of their income from attorneys' fees awarded as part of class-action settlements.  For example, class actions that they have obtained attorneys' fees for settling include *Nguyen v. T-Mobile USA, Inc.*, No. JCCP 4332 (Cal. Super. Ct. Alameda Cty.), and *White v. Cellco Partnership d/b/a Verizon Wireless*, No. RG04 137699 (Cal. Super. Ct. Alameda Cty.).

24.     The U.S. Supreme Court's recent decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011)—which confirmed that ATTM's arbitration agreement is enforceable—precludes Bursor from maintaining class actions against ATTM in the name of its customers.

The decision thus represents a clear threat to Bursor's business model of extracting lucrative attorneys' fee awards from businesses targeted by class actions.  Indeed, Bursor currently is fighting tooth and nail to resist ATTM's motion to compel arbitration in a pending class action in which Bursor claims to have made a substantial financial investment.  *See Hendricks v. AT&T Mobility LLC*, No. 11-cv-409-EMC (N.D. Cal.).

25.     In reaction to the Supreme Court's decision in *Concepcion*, which was issued on April 27, 2011, Scott Bursor told a reporter that he decided "to put that [ATTM arbitration process] to the test."  Terry Baynes, Reuters, Law Firm Strikes Back At AT&T Over Merger (July 27, 2011).

26.     Bursor—along with Faruqi and Thornton, Davis & Fein—has already commenced 26 arbitrations before the AAA.  To do so, they have enlisted a familiar cast of characters as the figurehead plaintiffs.  In fact, 13 the 26 claimants who have already filed demands are either Faruqi attorneys or individuals who have served in the past as named plaintiffs in class actions brought by Bursor or Faruqi.

27.     Specifically, of the claimants who have filed essentially identical demands, Chris Marlborough, Juan Monteverde, Richard Gonnello, Beth Keller, Sandra Smith, and Emily Komlossy are Faruqi attorneys.  And Richard Colosimo, Jared Pope, Leaf O'Neal, Alexis Ubiera, Alexis Justak, Leslie Bernardi, and Astrid Mendoza are plaintiffs who have been represented by Bursor or Faruqi in prior class or collective actions.

28.     Bursor and Faruqi represented Richard Colosimo, a former Faruqi attorney, in a 2010 consumer class action against ATTM.  *See Colosimo v. AT&T*, No. 2:10-cv-01495 (D.N.J. filed March 24, 2010).  Faruqi also represented Leaf O'Neal and Jared Pope in a Fair Labor Standards Act collective action against the health club, Club Fit.  *See Bazzini et al. v. Club Fit*

*Mgmt., Inc.*, No. 1:08-cv-04530 (S.D.N.Y. 2008).  Currently, Faruqi represents O'Neal and Alexis Ubiera in a separate FLSA action against three sports club operators for unpaid wages. *See O'Neal et al. v. Frem Group, L.P. et al*, No. 2011-cv-02633 (S.D.N.Y. filed April 18, 2011). Further, Alexis Justak is a named plaintiff in a consumer class action handled by Bursor and Faruqi against the food producer, ConAgra Foods.  *See Scarpelli v. ConAgra Foods, Inc.*, No. 2:11-cv-04038 (D.N.J. filed July 14, 2011).  Leslie Bernardi, represented by Faruqi, and Astrid Mendoza, represented by Bursor, were class representatives in two class actions against ATTM and Cingular Wireless.  *See Meoli, et al. v. AT&T Wireless PCS, LLC, et al.*, No. RG 03086113 (Cal. Super. Ct. 2008); *Mendoza, et al. v. Cingular Wireless LLC, et al.*, No. RG 03114152 (Cal. Super. Ct. 2008).

29.     In commencing these arbitrations, the intent of Bursor and Faruqi is patently evident: to institute against ATTM representative actions seeking class-wide relief wrapped in the guise of individual arbitration proceedings.

30.     In fact, ATTM's arbitration provision (attached as Exhibit A) does not permit customers to pursue the representative claims for class-wide relief that Bursor and Faruqi have instituted on the defendant's behalf.  Among other limitations on the scope of arbitration, the agreement expressly precludes "any form of representative or class proceeding" and permits claims for injunctive relief "only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim."

31.     Despite these restrictions, Bursor and Faruqi have sent ATTM more than 900 nearly identical Notices of Dispute—each on behalf of a different customer the firm purports to represent—demanding that ATTM terminate its merger agreement with T-Mobile within 30 days.  Submitting a Notice of Dispute is the first step in the dispute-resolution process under

ATTM's arbitration provision.  If a dispute is not resolved within 30 days from the filing of the notice, a customer may commence arbitration by filing a Demand for Arbitration with the American Arbitration Association ("AAA").

32.     The 26 Demands for Arbitration that Bursor and Faruqi have filed with the AAA are nearly identical in substance and copied largely verbatim from comments and petitions filed with the FCC in opposition to the merger, in particular from the papers filed by Sprint, a lead opponent of the merger.  Indeed, even though Bursor and Faruqi seek to preempt government review of the merger, portions of the demands urge the DOJ and FCC to pursue an intensive investigation into the proposed merger.  Moreover, each Demand seeks the same indivisible, class-wide, collective relief: an order enjoining the merger between ATTM and T-Mobile under the Clayton Act, 15 U.S.C. § 26 and, failing that, an injunction imposing a number of burdensome restrictions on the terms of the merger.  Defendant is among those on whose behalf Bursor and Faruqi have filed Demands for Arbitration.

33.     Although styled as a request for arbitration on an individual basis, each Demand is actually a representative action.  As the basis for defendant's and the other claimants' Clayton Act claims, each Demand asserts that the merger would cause a variety of "public interest harms" with no benefit to "the public at large," "including a loss of American jobs," "reduced investment in America," "serious adverse implications for the U.S. economy as a whole," "stifle[d]" innovation, a "waste" of the wireless spectrum, and harm to competition, independent wireless retailers, and wireless "consumers" alike.  It even complains that the merger will not benefit "T-Mobile subscribers."

34.     Moreover, as the purported remedy for these public concerns, each Demand asserts a representative claim seeking class-wide relief in the form of an injunction flatly

prohibiting the merger or, alternatively, imposing global restrictions on the merger. Such a remedy would impact each of the more than 120 million customers of ATTM and T-Mobile as well as the wireless industry, the American economy, organized labor, America's high-tech industry, rural and smaller communities around the country (which will as a result of the merger get access to 4G LTE service), and thousands of other companies and organizations that will benefit from the merger. If these multiple improper arbitrations were permitted to proceed, notwithstanding the compelling reasons why they should not proceed, members of this huge class who support the merger would have their rights determined adversely by the injunctive relief sought by defendant and the other claimants. Indeed, among the many representative aspects of this class-wide injunctive relief, defendant's Demand requests restrictions on AT&T's wireline DSL broadband service—which has nothing to do with defendant's wireless service—as well as an order divesting portions of ATTM's wireless spectrum holdings to competitors so that "the public interest would be best served."

35. Defendant does not assert any individual claims, and he does not seek any relief—injunctive or otherwise—that would affect only him as the particular claimant initiating the arbitration. For example, defendant does not seek damages for any of the alleged injuries that he says the merger would cause. Nor does he seek an individual injunction that (if his claims were proven on the merits) would be permitted by the arbitration provision, such as one requiring ATTM to preserve his own individual rate plan for some time period following the merger. Were he to present such individualized claims for relief, Princi—and every one of the other individuals whom Bursor and Faruqi purport to represent—would be able to resolve those claims under the arbitration agreement.

36.     Instead, the relief sought by defendant bears all of the characteristics of a representative action:  it would affect a broad class—millions of individuals, businesses, and organizations of every type—and even if just defendant or one of the other similarly-situated individuals prevails, the interests of the entire class would be affected.

37.     Accordingly, the defendant's Demand is outside of the scope of arbitration available under defendant's arbitration agreement.   Moreover, defendant cannot pursue his claims because he seeks to resolve collective disputes in proceedings that would exclude the millions of customers and countless organizations and government entities that would be affected by the non-individualized relief that defendant demands.   Because questions of arbitrability are for the court and not the arbitrator to decide, this Court should enjoin defendant from continuing his arbitration and issue a declaratory judgment stating that defendant's Demand is outside the scope of his arbitration agreement and that defendant is therefore precluded from pursuing it in arbitration.

**CLAIMS FOR RELIEF**
**Count I:  Federal Arbitration Act**

38.     Plaintiff ATTM repeats and realleges the allegations in paragraphs 1 through 37 above as though fully set forth herein.

39.     Questions of arbitrability—including whether asserted claims are outside the scope of the governing arbitration agreement—are for a court, not the arbitrator, to decide in the first instance.   Indeed, the arbitration agreement between ATTM and defendant specifies that "issues relating to the scope and enforceability of the arbitration provision are for the court to decide."

40.     Defendant has filed a Demand for Arbitration that asserts representative claims and seeks class-wide relief outside the scope of his arbitration agreement with ATTM.

41.     The arbitration agreement between ATTM and defendant is a valid and binding contract supported by consideration on both sides.  In exchange for ATTM's promise to provide wireless service in accordance with the terms of the agreement, defendant promised to pay for that service on a monthly basis and to adhere to the terms of the agreement.

42.     The agreement provides that "[t]he arbitrator may award injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.  YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.  Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding."

43.     In direct violation of these terms, defendant has filed representative claims seeking class-wide injunctive relief, which the AAA has docketed and started administering.

44.     The Federal Arbitration Act, 9 U.S.C. §§ 1-16, authorizes an injunction to prevent the arbitration from proceeding.  Under Section 4 of the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition" a federal district court "for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  "The power to enjoin an arbitration is the concomitant of the power to compel arbitration and thus the same provision of the FAA, 9

U.S.C. § 4, authorizes both types of orders." *PCS 2000 LP v. Romulus Telecomm., Inc.*, 148 F.3d 32, 35 (1st Cir. 1998) (internal quotation marks and citation omitted).

45. The AAA has stated that "in the absence of an agreement by the parties or a court order staying this matter, the AAA will proceed with the administration of this matter" and has communicated with the parties for purposes of beginning the process of appointing arbitrators in response to defendant's Demand. Unless enjoined, defendant will continue to pursue his claims.

46. ATTM is suffering, and will continue to suffer, substantial irreparable harm as a result of this breach by being forced to arbitrate a Demand that is beyond the scope of its arbitration agreement.

47. ATTM is entitled to an injunction that precludes defendant from further pursuing his Demand for arbitration.

48. Unless defendant is enjoined, ATTM will suffer irreparable harm in that ATTM will be obliged to defend itself in the arbitration proceeding or risk an adverse ruling in its absence. Participating in that *ultra vires* proceeding would deprive ATTM of its right to arbitrate only those matters that it agreed to arbitrate. That deprivation constitutes irreparable harm as a matter of law. Permitting the arbitration to proceed would also irreparably subject ATTM to burden and expense on an unprecedented scale, as defendant and the other claimants would force ATTM to arbitrate potentially hundreds—if not more—repeated, parallel proceedings before ATTM could present to a court the question of the arbitrability of their claims, and the very authority of the arbitrator to hear those claims.

49. The irreparable injury to ATTM would be particularly severe in light of the complexity of the defendant's claims, which are aimed at enjoining or placing conditions upon a

$39 billion merger. First, defendant and the other claimants seek to replicate in each arbitration the detailed assessments of the AT&T Mobility/T-Mobile merger now being conducted by the FCC, DOJ, and the public utility commissions of California and Hawaii. Second, defendant seeks to preempt those detailed assessments by having an arbitrator issue an injunction barring ATTM and T-Mobile, USA from consummating the merger. Third, defendant seeks to override the decisions of the three states—Arizona, Louisiana, and West Virginia—that already have granted approval to the merger. As described above, ATTM has been participating in extensive reviews of the merger by the DOJ, FCC, and state authorities. ATTM alone has submitted more than 1.4 million pages of material and nineteen substantial affidavits to the FCC. Tens of thousands of other interested parties have made submissions—both in support of and opposing the merger. And as defendant's arbitration demand makes clear, ATTM would be forced to arbitrate extremely complicated issues including the identity of the relevant markets, the potential effect of the merger on competition and prices, the extent of network and other synergies arising from the merger, and the possible enhancements of technological innovation—all on a class-wide scale and in as many as 1,000 or more identical impermissible proceedings.

50.     Defendant will suffer no harm from the injunctive relief ATTM seeks, much less irreparable harm. Under ATTM's arbitration provision, defendant remains fully entitled to pursue an individual claim for any damages that he sustains or for narrowly tailored, individualized injunctive relief affecting only defendant and not third parties—*i.e.*, an injunction "only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." Moreover, defendant may request that the FCC or DOJ take action—just as the tens of thousands of consumers and businesses that have filed comments with the FCC have done. And the enforcement of the terms of the defendant's

arbitration agreement will cause him no harm, as defendant has no right to arbitrate claims that are beyond the scope of his arbitration agreement.

51.     In light of the irreparable harm that defendant's unauthorized arbitral proceeding will inflict on ATTM, and the lack of harm to defendant, the balance of equities tips decidedly in favor of awarding injunctive relief to ATTM.

52.     The public interest would also be served by the injunctive relief ATTM requests. The proposed merger between ATTM and T-Mobile will benefit the millions of customers who subscribe to wireless service from both companies and the marketplace for wireless services as a whole.  By wrongfully asking arbitrators to enjoin the merger, defendant seeks to short-circuit the congressionally mandated regulatory review process of the DOJ and the FCC, as well as the review process of five state public utility commissions.  Indeed, the arbitration effectively seeks to set aside the determinations of three state public utility commissions—made after public hearings and careful deliberations—to approve the merger.  This thorough government review process, led by the DOJ and the FCC, is designed to address and determine whether the merger will advance or adversely impact competition and whether the merger is in the public interest. Defendant's attempt to prevent the merger from being consummated through proceedings that are closed to the thousands of interested consumers, businesses, organizations, and states that are participating in the federal and state regulatory proceedings would circumvent this carefully calibrated regulatory review process and thereby greatly injure the public interest.

53.     ATTM also is entitled to a declaratory judgment stating that defendant's Demand is outside the scope of permissible arbitration under his arbitration agreement and that defendant is therefore precluded from pursuing the Demand in arbitration.

## Count II:  Breach of Contract

54.     Plaintiff ATTM repeats and realleges the allegations in paragraphs 1 through 53 above as though fully set forth herein.

55.     As discussed above, the arbitration provision contained in defendant's contract with ATTM precludes defendant from pursuing his arbitration Demand.

56.     Defendant's filing of his arbitration Demand and pursuit of the ensuing arbitration constitutes a material breach of defendant's contract with ATTM.

**WHEREFORE**, Plaintiff requests the following relief:

A.     Judgment in ATTM's favor and against defendant declaring that his Demand is outside the scope of his arbitration agreement and therefore that defendant's arbitration may not proceed;

B.     A preliminary and a permanent injunction against defendant that prohibits him from pursuing in arbitration his Demand or any other representative claims for collective relief;

C.     Specific performance of defendant's arbitration agreement;

D.     Reasonable attorneys' fees and all costs associated with this action; and

E.     Such other relief as may be just and proper.

21

Dated:  August 12, 2011

Respectfully submitted,

AT&T Mobility LLC

*By Its Attorneys*

/s/ Matthew T. McLaughlin
Jonathan Sablone (BBO No. 632998)
Matthew T. McLaughlin (BBO No. 660878)
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts  02110
Tel:  (617) 345-1000
Fax:  (617) 345-1300
jsablone@nixonpeabody.com
mmclaughlin@nixonpeabody.com

*Of counsel*
Andrew J. Pincus
Evan M. Tager
Archis A. Parasharami
Kevin Ranlett
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3217
Facsimile: (202) 263-5217